**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PATRICIA SLOAN,                           )
                                          )
                   Petitioner,            )          Civil Action No. 07-57
                                          )
         v.                               )          Judge Conti
                                          )          Magistrate Judge Bissoon
THE ATTORNEY GENERAL OF                   )
THE COMMONWEALTH OF                       )
PENNSYLVANIA, *et al.*,                   )
                                          )
                   Respondents.           )


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.  RECOMMENDATION**

It is recommended that the Petition for Writ of Habeas Corpus filed by Patricia Sloan be

dismissed and that a certificate of appealability be denied.

**II.  REPORT**

This is a counseled Petition for Writ of Habeas Corpus filed on behalf of Patricia Sloan

("Sloan" or "Petitioner").  On December 5, 2000, a jury found Sloan guilty of First Degree

Murder and Conspiracy in the 1983 murder of her husband, Willis Casteel.  She was sentenced to

life imprisonment on February 21, 2001.  The conviction and sentence were upheld on direct

appeal, and Sloan's collateral appeal was denied by the state courts.  Sloan now seeks relief

pursuant to 28 U.S.C. § 2254, and raises numerous claims of trial error and ineffective assistance

of trial counsel and direct appeal counsel.

**A.  Facts of the crime.**

Linda Galet and her husband moved to a home located at 1053 Frye Road in Jeannette,

Pennsylvania, in 1986.  Thirteen years later, on August 9, 1999, Mrs. Galet was working with

was excavating a few feet of the dirt floor in the basement of the home so that a concrete floor and a new furnace could be installed (TT 110-120).[1]  Mrs. Galet's laborious task of removing the clay-like soil was interrupted when her shovel struck Willis Casteel's long-buried shin bone about 2 feet below the surface (TT 119, 127).  She and her husband then unearthed a length of rope that was wrapped around the bone, and the next shovelful of dirt revealed a boot (TT 119-120).  The Galets then contacted the police (TT 120).

Although the remains exhumed by the authorities were mostly skeletal, the chest cavity was still intact due to a "hard, waxy" substance that had formed over time (TT 177).  During the autopsy, 49 shotgun pellets were removed from the "upper left chest cavity" (TT 174).  The wrists and legs of the corpse had a total of 39 feet of cord wrapped around them, with the ends of cord being looped and knotted (TT 174; 178).  Coins were found in the deceased's pocket, with none dated later than 1983 (TT 174).

Mark Mogle is a forensic scientist employed by the Pennsylvania State Police (TT 193-194).  He was permitted to testify at trial as an expert in the examination of cuts and tears in materials as well as evidence concerning the use of firearms on materials (TT 197).  Mogle located 7 holes on the right front side of Casteel's work shirt that were consistent with cuts made by a knife, and he also identified large holes surrounded by smaller holes in the shirt consistent with a shotgun blast to the left chest area (TT 199-200).  Mogle counted 21 cuts in the back of the shirt, and 6 additional cuts on the sleeve (TT 201), and he identified cuts and holes in the deceased's undershirt consistent with the cuts and holes in the work shirt (TT 202-203).

Dr. Dennis Dirkmaat, an Associate Professor of Anthroplogy at Mercyhurst College, specializing in forensic anthropology, is an expert in determining the identity of human remains

---

[1] Numerals in parenthesis preceded by the letters "TT" refer to pages in the Trial Transcript dated November 29 through December 5, 2000.

(TT 218-219, 221).  The autopsy conducted by Dr. Dirkmaat found the victim to be a white

male, more than 50 years old at the time of death, and standing between 5 feet 8 inches and 6 feet

3 inches in height, and possessing no teeth (TT 255-256, 258).  Evidence of gunshot trauma was

noted in the upper torso and neck region, and Dr. Dirkmaat also found a shotgun pellet

embedded in a broken vertebrae (TT 261), as well as dents in the collar bone and upper arm from

pellets that were no longer embedded (TT 264-265).  Finally, Dr. Dirkmaat noted "knife-like

trauma" to the right shoulder blade, scapula and ribs (TT 266).

     Forensic Pathologist Dr. Cyril Wecht testified that the shirts taken from the corpse show

characteristics of a shotgun blast, as do x-rays of the corpse (TT 308).  Further, several bone

fractures consistent with pellet injuries and/or knife-like nicking were apparent, with the larger

fractures on the right side indicating the presence of stab wounds (TT 310-311).  Dr. Wecht

opined that the cause of death was a shotgun blast to left side of the chest and multiple stab

wounds to right front side and left back of chest (TT 313, 314).

     A blood sample was taken from Willis Casteel's sister, Buelah I. Lindsay, and was

compared to hair and bone marrow samples from the corpse (TT 189).  DNA analysis revealed

that the samples taken from the corpse "cannot be excluded from a maternal relative of Beulah I.

Lindsay." (TT 291).  Evidence that the corpse's DNA did not match any of the 4,142 individuals

then in the FBI database also was admitted (TT 293).

     While the medical and forensic evidence was being gathered, the police investigation

quickly focused upon the last people to inhabit the home before the Galets purchased it in 1986:

Willis Casteel, his wife (Petitioner), and Casteel's step-daughter Bonnie Casteel.  A neighbor

was able to obtain leases signed by Willis Casteel and Patricia Sloan Casteel for the periods

May, 1981 through April, 1982, and May, 1982, through April 30, 1983 (TT 143-144).  Within a

few days of the body being discovered, a neighbor recalled attending school with Bonnie

Casteel, and was able to identify her picture from a 1982 high school yearbook (TT 342).  An

internet search revealed that Bonnie Casteel had since married and was now known as Bonnie

Neely of Altoona, Pennsylvania (TT 343).

On August 16, 2009, Westmoreland County Detective Richard Kranitz interviewed

Bonnie Neely, who confessed that she and her mother killed and then buried Willis Casteel (TT

343, 387-396).[2]  Petitioner Sloan was arrested at about 12:46 a.m. on August 17, 1999, and

initially denied involvement in the murder (TT 348, 355).  However, when told by police that

they knew she and Bonnie had killed the victim with knives and a shotgun and had then buried

him in the basement, Sloan admitted to killing Casteel.  She later gave a detailed, taped

confession (TT 358, 367-381).

Sloan stated in her confession that in the fall or winter of 1983, Willis Casteel was

planning to stage an "accident" to get Bonnie and her boyfriend incarcerated.  Sloan suggested to

her daughter that they "get even with him for all the hurts he'd done her" (TT 370).  Casteel was

trying to stop Sloan from going to Bonnie's wedding, and to prevent Bonnie from graduating

high school (TT 371).  According to Sloan, she and her daughter confronted Casteel, each

holding a knife, and told him "if he didn't straighten up, that he was going to die, and he laughed

and said he was going to have my daughter and her boyfriend put in jail." (TT 371).  After

stabbing Casteel several times, and noting that "he still wouldn't cooperate," Sloan "went and

---

[2]  It should be noted that Detective Krantiz testified on direct examination that Bonnie Neely gave the police a statement, and that an arrest warrant was then obtained for Petitioner, but he gave no details of Neely's statement during his direct examination (TT 345).  Rather, the details of Bonnie Neely's statement to police were revealed to the jury during defense counsel's cross-examination of Detective Krantiz for reasons that will be explained below.

got the gun . . . I shot him.  How many times, I don't know.  I was just so angry."  (TT 371).  She continued:

> I just wanted it all to be over, my daughter to graduate, my daughter to get married, the abuse to stop.  I just couldn't, couldn't handle being married to him anymore.
>
> *    *    *
>
> When he wouldn't be reasonable, I just went blind with rage.  I had to destroy him.  He wouldn't let my daughter graduate, get married.  He had made life a living hell for us, and I just wanted it to stop.

(TT 371, 374).

Petitioner described burying Casteel's body that same night and cleaning up the blood (TT 371-372).  She did not recall whether Bonnie helped dig the grave, but she did recall that Bonnie helped place the body in the grave, and that they used a blanket and some ropes to accomplish this task (TT 372).

After the murder, Sloan decided to go back to Michigan where she and Casteel had been married and obtain a divorce to "cover the tracks" (TT 373).  Sloan threw the knife away, and sold the gun (TT 373).  "I was trying to cover up as best I could so Bonnie could graduate, she could get married, you know, and not have to pay for my mistake of marrying Will."  (TT 374).

On cross-examination, defense counsel explored some details of Bonnie Neely's statement to police.  Bonnie's "immediate reaction [to police] was, you found him in the basement, didn't you, is that right?" (TT 387).

### B.  Petitioner's defense at trial

Petitioner was represented by co-counsel Jeffrey Monzo and James Wells during her trial. At the outset, the defense theory of the case was based solely on a justification defense premised upon battered woman's syndrome, and Dr. Maryanne Dutton was retained as an expert and sent

all of the case files (PT 5-6).[3]  Dr. Dutton was scheduled to meet with Sloan on August 25, 2000,

but Sloan sent letter a to trial counsel Monzo in July, 2000, indicating that she was "retracting"

her confession, and that she was not involved in the murder (PT 7).  Monzo and his co-counsel

met with Sloan several times while she was in jail awaiting trial, and they each attempted to

convince Sloan to change her mind about her defense (PT 9-10).  Sloan, however, "had no

interest in pursuing that [battered women's syndrome] defense any longer, and was adamant that

she was not involved in this killing, and that she confessed to the killing to protect her daughter,

Bonnie." (PT 10).  Counsel nonetheless contacted Dr. Dutton "and asked her to still come, if she

would." (PT 11).  Dr. Dutton informed counsel that "there wasn't much she could do" in light of

Sloan's change of testimony (PT 11).  Counsel had no choice by to abandon the battered

woman's syndrome defense because Dr. Dutton refused to interview Sloan unless she admitted

to the crime (PT 26).

   After discussions with other experienced defense counsel, counsel for Petitioner decided

to focus on actions of the police during their interview with Sloan to "try to pick apart their prior

testimony to establish that [police] had told her what happened" to lend credence to her claim

that she made up her confession to protect her daughter (PT 12).  Counsel knew that they needed

to convince the jury that she had "educated herself" to the point she was able to give a detailed

(if false) confession (PT 12).

   The defense first called Larry Casteel, Willis Casteel's son from a prior marriage.  Larry,

who was born in 1953, had no relationship with his father who left and would "pop in" every 2 to

3 years to see him and his 7 siblings (TT 430).  Willis Casteel beat the children with a belt, and

also did this to their mother on one occasion (TT 431).

_____

[3] Numerals in parentheses preceded by the letters "PT" refer to pages in the "PCRA Hearing"
Transcript dated April 18, 2005.

Patricia Sloan testified that she became pregnant with Bonnie when she was 18 years old and move back in with parents for 7 years (TT 436-37).  She then moved to East Detroit and lived with Bonnie there while working at Hawthorne Metal (TT 438).  She put an ad in a tabloid looking for a date, and Willis Casteel responded (TT 440).  They dated for about 4 months, with Casteel coming to Michigan from Pennsylvania when his job permitted (TT 443).  Petitioner and Casteel married on April 12, 1980 (TT 443).  No one showed up from his side of the family (TT 443) , and he never told her that he had been previously married, and denied having children (TT 444).

Casteel insisted she sell her house and move to Pennsylvania (TT 445).  They lived in a duplex he was renting in rural area (TT 446) for a few years and then moved to the Frye Road address after that (TT 447).  Sloan testified that she was lonely and dependent on Casteel (TT 448).  Casteel told her not to talk to the neighbors as they were "liars and troublemakers," and Sloan was not permitted to speak to anyone (TT 448), to go to church, or to make phone calls (Casteel had a lock on the telephone and kept the key) (TT 449, 450).

Casteel reneged on a promise to adopt Sloan's daughter Bonnie, and his relationship with Bonnie went downhill (TT 451).  Casteel did not want Bonnie dating (TT 451), and this made her "very angry" (TT 453).  Sloan repeatedly argued with Casteel about his treatment of Bonnie (TT 454).  The arguments began as verbally, but progressively became more and more physical, with Casteel pushing and slapping Sloan, after which he would "beat me up," but always hit her where clothes would cover the marks (TT 454).

Casteel was fired from his job shortly after they moved to the Frye Road residence (TT 456).  He began drinking on Fridays, then most nights, and often would not come home, sometimes leaving for a few weeks at a time (TT 456-457).  "At one point, we had a very bad

argument, because I had let Bonnie start dating again.  She was dating Mr. Neely, and [Casteel] was furious, and he took some clothes and said he was going to leave.  He would be back, which [he] did do about a week later, and then I didn't see him anymore." (TT 458).  Sloan saw Casteel one other time when he stopped to pick up his mail in "the early part of the month" in the fall of 1983 (TT 458, 461).  Casteel had taken his SSI checks from the mailbox (TT 459).  He stopped picking up his checks about 4 or 5 months later (TT 460), and she mailed any further checks back to Social Security (TT 461).[4]

Bonnie graduated in 1984, moved out immediately and married Ralph Neely, who she had been dating since before Casteel left (TT 464).  Sloan testified that she moved back to Michigan to live with her parents (TT 465).  She claimed that when became financially able, she divorced Casteel (TT 465).  She indicated in the divorce decree that she and Casteel cohabitated at Frye Road until September, 1984, but explained that this was what the attorney wrote down (TT 466).  Sloan moved back to Pennsylvania in 1988 (TT 466).  She became incapable of working in 1992, and moved into public housing in Beaver Falls (TT 467).

Sloan remembers that police awoke her from sleep on August 17, 1999, and was told she was being arrested for killing Willis Casteel to which she replied, "no, I divorced him." (TT 468).  Sloan indicated that she thought the police meant Casteel had just recently been murdered, so she wanted to show through her divorce that she no reason to kill him after such a passage of time (TT 468-469).  Sloan contended that Detective Kranitz told her of Bonnie's statements (TT 470), and told her Bonnie was in "lock up" (TT 471).  Detective Kranitz provided

---

[4] The prosecution presented testimony from a Social Security Administration employee that Willis Casteel first received a Social Security Disability check on November 3, 1983, and continued to receive checks until November 3, 1984, at the rate of $481 per month, as well as a lump sum payment of $3,219.73 in April, 1984 (TT 330).  Bonnie also received Social Security benefits for that same time frame (TT 331).  All of the checks were cashed with the exception of Willis Casteel's November 3, 1984 check (TT 333).

great detail in describing the crime, including where the body found, the use of ropes, the army blanket the corpse was wrapped in, and Bonnie's claim that she stabbed Casteel in the arm twice, but that Sloan did the remaining stabbing and shooting (TT 472).

At trial, Sloan claimed that Bonnie had committed the murder, but that she had forced her daughter to do this by marrying Casteel (TT 473).  Sloan decided to confess so that Bonnie could "go free" (TT 473).  Sloan claimed that Kranitz had already gone over the facts 7 to 10 times, but she asked Kranitz to repeat it, which he did an additional 4 or 5 more times, "until [she] was saying what the Detective wanted [her] to say." (TT 473).  Sloan, allegedly, changed her mind about trying to spare her daughter prior to trial, when she realized Bonnie's charges had not been reduced, and she realized could no longer help Bonnie (TT 476-477).

On cross-examination, Sloan conceded that the first Social Security check Willis Casteel received may have been dated November 3, 1983 (TT 483).  She claimed that she remembered him coming on two consecutive months for the checks, but doesn't recall Bonnie ever receiving SSI checks (TT 485), because Willis took them (TT 485).[5]

### C.    Post-Sentence Motions

Attorney James Fox was appointed to represent Petitioner on post-sentence motions and direct appeal.  The following claims were raised on post-sentence motions:

> 1.   The trial court erred in failing to grant Sloan's Motion to Suppress her confession;

---

[5] The Commonwealth established the approximate time of Mr. Casteel's demise through the testimony Bonnie Neely's husband, Ralph Neely.  Ralph Neely was dating Bonnie in mid-September, 1983, when he met Petitioner Willis Casteel at their home (TT 406-407).  Ralph Neely never saw Willis Casteel again (TT 407).  Mr. Neely recalls picking Bonnie up for a Halloween party in October, 1983, and that she seemed "a bit off" (TT 410-411).  Bonnie was with Neely and his family during Thanksgiving in 1983, and, after a telephone call from Petitioner, Bonnie inform Ralph Neely that "it" (referring to Willis Casteel) had "taken off" (TT 412).

2. The trial court erred in admitting DNA evidence with a <u>Frye</u>[6] hearing;

3. The trial court improperly limited the defense in challenging the DNA evidence that was presented at trial;

4. The trial court erred in allowing the jury to determine if the Commonwealth had established the *corpus delicti* sufficiently to consider Sloan's confession;

5. Trial counsel rendered constitutionally ineffective assistance in the following instances:

   a. Trial counsel failed to request a <u>Frye</u> hearing concerning DNA evidence;

   b. Trial counsel failed to retain an expert witness to assist the defense in addressing the DNA evidence;

   c. Trial counsel's inaction resulted in there being no challenge to the corpse being identified as Willis Casteel;

   d. Trial counsel failed to object to the witness Mogle offering expert testimony concerning the holes in the decedent's shirt;

   e. Trial counsel was ineffective for failing to object to the trial testimony of Detective Kranitz concerning the content of Bonnie Neely's confession which was both hearsay and a violation of <u>Bruton v. United States</u>, 391 U.S. 123 (1968);

6. The evidence was insufficient to convict, including a failure to prove the decedent's identity.

(State Court Record, Doc. 68).

On July 18, 2001, the trial court held a hearing on the Petitioner's motions.  Petitioner testified that she recalled Detective Kranitz admitted during a preliminary hearing that he had "rehearsed" Petitioner's confession with her, but defense counsel failed to make this argument

---

[6]     <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923) (common law "generally accepted" rule for admission of scientific evidence).

during the pre-trial suppression hearing (PST 6-7).[7]  She also testified that counsel failed to call

Vivian Dominick to testify at trial that Willis Casteel had attempted to kill a woman he lived

with prior to meeting Petitioner (PST 13).  Petitioner identified character witnesses who she

wanted counsel to call at trial, but counsel could not locate of the witnesses, and thought another

was not believable (PST 20-21).  She did not know why two others were not called (PST 21).

Trial counsel Monzo testified that Detective Kranitz never admitted to "rehearsing"

Petitioner's confession (PST 26).  Counsel reviewed the preliminary hearing transcript several

times, and the comment Petitioner refers to is "just not there" (PST 26).   Counsel was aware of

Vivian Dominick as a potential witness, and attempted to present her testimony during trial.  The

trial court noted that Sloan was not aware of Casteel's prior alleged assault at the time she killed

him, making Dominick's testimony irrelevant (PST 28).

Further, Monzo spoke to proposed character witness Wells who was "rambling on" and

not "credible" (PST 29).  Wells would "say one thing and then say the exact opposite in the next

sentence." (PST 29).  Counsel was unable to contact Peter Sowatskey, although he called

numerous times and left messages (PST 30).  Sowatsky was, in any event, someone Sloan met

after she came back to Pennsylvania from Michigan (PST 30).  Counsel did not specifically

recall the names Flynn and Kirmayzn, but Sloan kept recommending character witnesses who

knew her only after she returned from Michigan in 1988, but did not know anyone else in the

community who knew Sloan because she was disabled and did not get out much (PST 31).

Monzo further testified that he and co-counsel were not greatly concerned with the DNA

evidence because their initial focus was on battered woman's syndrome, and not on attempting to

challenge the identity of the corpse (PST 32).  Monzo was recalled at a continued hearing on

---

[7] Numerals in parentheses preceded by the letters "PST" refer to pages in the Post Sentence
Transcript dated July 18, 2001.

August 28, 2001, and had reviewed his file concerning character witnesses (PST2 5).  Sloan gave defense counsel three names: Nancy Wells, Peter Sowatskey and Hazel Flynn (PST2 6).  Wells first met Sloan in 1997 (PST2 6).  Sowatskey likewise did not know Sloan at the time of the murder (PST2 10).  Counsel abandoned attempts to present character witnesses because the witnesses knew Sloan personally, but were not aware of Sloan's reputation in the community (PST2 9).

Trial co-counsel James Wells testified that he did extensive research into mitochondrial DNA testing and determined that it was accepted in the in the scientific community, but that there were questions about the significance of the statistical evidence the prosecution wished to present because the FBI database was so limited (PST 43).  Wells considered it a victory to keep the statistical evidence out, and this permitted them to argue that the "DNA match" was insignificant and did not identify the body as Willis Casteel (PST 44).  Counsel did not request a Frye hearing because mitochondrial DNA testing is, in fact, an accepted method in the relevant scientific community (PST 46).

The trial court denied Petitioner's motions, and specifically ruled that Petitioner's confession was voluntary (State Court Record, Doc. 87).  The court noted that Petitioner's testimony at trial was that she intentionally gave a false confession in an attempt to help her daughter, and that this testimony is additional evidence that the confession was voluntary.

The trial court also found that mitchondrial DNA evidence has been found reliable and admissible by other courts, and that trial counsel's failure to object did not cause Petitioner prejudice (Id., p. 4).  Further, the Court noted that it granted a defense motion to disallow testimony concerning the statistical analysis, and limited the expert testimony to the initial report which "suggested the samples originated from maternal siblings." (Id.).

The trial court also rejected a claim that it allowed the jury to make the initial ruling on the *corpus delicti*, and expressly found that witness  Mogle had established his expertise to testify concerning the likely cause of the tears and rips in Willis Casteel's shirts (Id., pp. 7-8).

Finally, the trial court determined that Kranitz's testimony concerning Bonnie Neely's statement was not hearsay because it showed the reason for his actions (Id., pp. 8-9).

### D.  Direct appeal

New counsel was appointed to represent Sloan on direct appeal to the Superior Court of Pennsylvania.  The following issues were presented on appeal:

I.      Whether the suppression court erred by failing to suppress Appellant's statements?

II.     Whether the trial court erred by allowing the Commonwealth to admit mitochondrial evidence without proof that the procedure was generally accepted within the scientific community?

III.    Whether the trial court erred by preventing the defense from effectively challenging the DNA evidence at trial?

IV.     Whether the trial court erred by allowing the jury to determine if the Commonwealth had established the *corpus delicti* in order to accept Appellant's confession?

V.      Whether trial counsel was ineffective by failing to request a <u>Frye</u> hearing as to the admissibility of the mitochondrial DNA and the statistical evidence supporting it, and by failing to retain an expert witness to assist in the analysis and understanding of the DNA evidence?

VI.     Whether trial counsel was ineffective in allowing a Commonwealth witness to testify as to a conclusion for which there was no foundation?

VII.    Whether trial counsel was ineffective in failing to object trial testimony that resulted in a violation of <u>Bruton v. United States</u>?

VIII.   Whether trial counsel was ineffective in failing to call character witnesses on behalf of [Sloan]?

(Doc 13-3, pp. 31-32).

The Superior Court addressed the first claim on its merits, and concluded that there was no basis for a finding that Petitioner's will was overborne (Doc. 13-3, p. 4).  The court noted that Plaintiff's testimony at trial was not that she was coerced to confess, but that she confessed in an attempt to protect her daughter (Doc. 13-3, pp. 4-5).

The Superior Court next found that Petitioner's challenge to the admissibility of mitochondrial DNA evidence, and her claim that she was denied the ability to challenge the DNA on cross-examination, were each waived due to a lack of objection at trial (Doc. 13-3, pp. 5-7).  In an alternative ruling, the Superior Court noted that it would have been inconsistent to both obtain a ruling that statistical DNA evidence was inadmissible, but then attempt to cross-examine the prosecution's expert on this issue (Doc. 13-3, pp. 6-7).

The Superior Court also found that trial counsel did not render constitutionally ineffective assistance in failing to request a <u>Frye</u> hearing concerning mitochondrial DNA evidence because the defense essentially conceded the identity of the body in the basement, and blamed the murder on Petitioner's daughter.  Thus, a challenge to the identity of the body would have been inconsistent (Doc. 13-3 p. 11).

Finally, the court noted that counsel had no basis to object to Detective Kranitz's comments concerning Bonnie Neely's confession based upon <u>Bruton</u> because the details of the confession were not presented to the jury on direct examination (Doc. 13-3 pp. 13-14).  Rather, the details of Neely's confession were disclosed by Petitioner "in an effort to show that [Petitioner's] knowledge of the crime as contained in her confession was gleaned from Bonnie's own confession." (<u>Id</u>., p. 14).

### E.  PCRA proceeding

Petitioner filed a pro se petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. 9541, *et seq*., on November 15, 2004 (State Court Record, Doc. 96).  Counsel was appointed to represent Petitioner, and an Amended Petition was filed on January 14, 2005 (Id., Doc. 99).  Petitioner raised the following claims:

1.  Trial counsel rendered ineffective assistance in:

  a.  Failing to present a defense based upon battered woman's syndrome;

  b.  Failing to object  and/or request a curative instruction at trial in connection with a reference by the District Attorney before the jury to the fact that Ms. Sloan was incarcerated;

  c.  Failing to cross-examine prosecution witnesses Mogle, Sethman, Dirkmaat, Nelson and Wecht.

(Doc. 99, p.3).  Petitioner also argued that direct appeal counsel rendered ineffective assistance in failing to present these claims on appeal.

The state court held a hearing on Sloan's Amended PCRA Petition on April 18, 2005. Jeffrey Monzo. Esq., co-counsel for Sloan during her trial, was called to testify.  As noted above, Monzo's theory of the case from the outset was based solely upon a Battered Women's Syndrome defense, but Sloan's decision to change her story and deny involvement resulted in the defense expert informing counsel that "there wasn't much she could do" in light of Sloan's change of testimony (PT 11).  Counsel then, consistent with Sloan's new theory, focused the defense on convincing the jurors that Sloan had "educated herself" from what the police told her about Neely's statement so that Sloan could then give a detailed confession herself in an attempt to shield Neely (PT 12).

Counsel chose not to engage in cross-examination of several prosecution witnesses. Specifically, they chose not to cross-examine witnesses Mogle (source of tears and rips in the

victim's shirts), Timothy Sethman (photographer who testified concerning the position and condition of the body), Dr. Dirkmaat (forensic anthropologist), Kimberly Nelson (DNA evidence) and Dr. Cyril Wecht because those witnesses did not specifically implicate Sloan in the murder (PT 17-20).

Monzo did not recall the prosecutor's reference to Sloan being incarcerated, but he was hoping that the prosecutor would be rough on Sloan in front of the jury so that he could use this in an attempt to garner sympathy for her (PT 21-22). And, in any event, counsel noted that the reference was not objectionable because it was not related to a prior incarceration (PT 23-24).

Post-trial and appeal counsel James Fox also testified. He did not include a claim of ineffective assistance on direct appeal premised upon trial counsels' decision to forego a battered woman's syndrome defense because such a defense would have been inconsistent with Sloan's testimony at trial (PT 33). Fox chose not to raise the issue concerning the prosecution's mention of Petitioner's incarceration because he thought there were better issues to pursue (PT 34). Fox agreed with trial counsel that cross-examination of witnesses who did not specifically implicate Sloan was a reasonable trial strategy because it "doesn't matter who's buried in the basement, if she didn't kill him . . .." (PT 37).

Although several claims were raised in the PCRA petition, only one issue was raised on appeal from the denial of PCRA relief: Whether trial counsel was ineffective for failing to object or to request a curative instruction concerning the prosecutor's reference to Sloan's incarceration (Doc. 13-5, p. 2). The Superior Court noted that the prejudice to be avoided in this situation was the possibility that the jury would infer that Sloan was guilty of some other crime, and that this might prejudice the jury against her (Doc. 13-5. pp. 3-4). The court ruled that the single, passing reference to the fact of Sloan's incarceration was entirely consistent with her being imprisoned

awaiting trial, and that this did not inject evidence of other crimes into Sloan's trial (Doc. 13-5,

p. 5).

### F.  Claims raised in the instant Petition and Amended Petition

Petitioner filed a *pro se* Petition in this Court on January 12, 2007 (Doc. 1), and raised the

following claims:

1. Trial counsel rendered ineffective assistance in violation of the Sixth Amendment
   when counsel:

   a.  failed to effectively litigate suppression of the confession;

   b.  failed to object to the reopening of the suppression hearing;

   c.  failed to request a <u>Frye</u> hearing challenging the admissibility of the
       Commonwealth's DNA evidence;

   d.  failed to effectively argue for the opportunity to fully cross-examine the DNA
       expert;

   e.  failed to retain necessary experts to assist in evaluating, analyzing and
       countering the Commonwealth's evidence, including but not limited to DNA,
       mental health, battered women's syndrome and forensics experts;

   f.  failed to object to the Commonwealth expert's testimony that the holes in the
       decedent's shirts were consistent with those from a shotgun;

   g.  failed to object to hearsay testimony admitted in violation of <u>Bruton v. United
       States</u>, 391 U.S. 223 (1968);

   h.  failed to call available fact and character witnesses;

   i.  failed to pursue a battered women's syndrome defense;

   j.  failed to object to or request a limiting instruction concerning objectionable
       comments by the prosecutor;

   k.  failed to object to the prosecutor's improper cross-examination of the
       defendant;

   l.  failed to file a motion in limine or object to the admission of prejudicial and
       irrelevant testimony;

    m.  failed to effectively cross-examine prosecution witnesses;

    n.  failed to conduct a thorough investigation;

    o.  failed to request or obtain necessary discovery, including exculpatory evidence;

    p.  failed to obtain transcripts of all pretrial proceedings;

    q.  failed to propose pertinent *voir dire* questions; and

    r.  failed to effectively argue that the conviction was based on insufficient evidence and/or that it was against the weight of the evidence.

2.  Post-Trial and appeal counsel rendered ineffective assistance in violation of the Sixth Amendment when counsel:

    a.  failed to raise meritorious legal issues in post-trial motions and on appeal;

    b.  failed to effectively challenge trial counsel's effectiveness;

    c.  failed to effectively challenge the sufficiency of the evidence;

    d.  failed to withdraw on appeal when it became apparent that he could not challenge his own ineffectiveness during post-trial motions.

3.  Petitioner was deprived of her Fifth Amendment rights to due process and against self-incrimination and her Sixth Amendment rights to present a defense and confront witnesses when;

    a.  the trial court prevented the testimony of Vivian Dominick;

    b.  the trial court admitted DNA evidence;

    c.  the trial court prevented defense counsel from challenging DNA evidence on cross-examination;

    d.  the trial court improperly permitted the Commonwealth to reopen the suppression hearing;

    e.  the trial court permitted the jury to consider whether the Commonwealth had established the *corpus delicti* without first making the required findings;

    f.  the defendant's confession was erroneously admitted into evidence;

    g.  the trial court failed to ask pertinent questions during *voir dire* of the jury;

    h.   the prosecutor made improper and unduly prejudicial remarks during trial;

    i.   the defendant's alleged accuser was not called at trial and defendant was not able to confront her;

    j.   the trial court admitted hearsay evidence that violated the rule in <u>Bruton</u>;

    k.   the evidence was insufficient;

    l.   the verdict was against the weight of the evidence;

    m.   the Commonwealth suppressed evidence that would have established that someone else committed the murder.

Counsel was appointed to represent Petitioner (Doc. 2), and an Amended Petition was filed

(Doc. 21).  Additional arguments were made concerning some of the issues set forth above,

including the following:

1.   Trial counsel were ineffective for failing to conduct a pretrial investigation, interview and call available witnesses and develop known facts for use at trial to challenge the Commonwealth's case, and the related claim that post-trial/appellate counsel rendered ineffective assistance in failing to raise this claim in post-trial motions or on direct appeal;

2.   Trial counsel were ineffective in failing to consult with Petitioner about, and in failing to object to, retaining Juror Sukala after the District Attorney reported that Ms. Sukala attended a party hosted by the District Attorney, and the related claim that post-trial/appellate counsel rendered ineffective assistance for failing to raise this claim in post-trial motions or on direct appeal;

3.   Trial counsel were ineffective for failing to seek a limiting instruction from the trial court as to the Jury's consideration of Bonnie Neely's confession and the related claim that post-trial/appellate counsel rendered ineffective assistance for failing to raise this claim in post-trial motions or on direct appeal;

4.   Post-trial/appellate counsel was ineffective for failing to raise, brief and argue the trial court's excluding, over Defendant's objection, the testimony of Vivian Dominick.

(Doc. 21).  The Commonwealth Answered the Petition (Doc. 12) and the Amended Petition

(Doc. 23) and Petitioner filed a Reply Brief and Response (Docs. 25 and 26).

G.    **Exhaustion and procedural default**

    1.    **Exhaustion**

The habeas statute, 28 U.S.C. § 2254(b), requires a state prisoner to exhaust all available state court remedies before seeking federal relief.  This exhaustion requirement serves to protect the interest of comity, which ensures that the state courts have the first opportunity to address and correct violations of state prisoners' federal rights.  Rose v. Lundy, 455 U.S. 509, 518 (1982); Preiser v. Rodriguez, 411 U.S. 475, 491 (1973).  Generally, in order to satisfy the exhaustion requirement, "a state prisoner seeking federal habeas relief must present each of his claims to the state's highest court."  Story v. Kindt, 26 F.3d 402, 405 (3d Cir. 1994).  Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state prisoner's claims prior to exhaustion when no appropriate state remedy exists.  Christy v. Horn, 115 F.3d 201, 206 (3d Cir. 1997).  Thus, before reaching the merits of any claim raised by Petitioner, the Court must first determine whether constitutional and federal law issues have been fairly presented to the state courts through direct appeal, collateral review or other available procedures for judicial review.  Castille v. Peoples, 489 U.S. 346, 351 (1989); Picard v. Connor, 404 U.S. 270, 275 (1971).

Petitioner has exhausted state court remedies with respect to claims 1(c), (d), (e) (with respect to the failure to retain an expert on DNA evidence only), (f), (g) and (h) and 3 (e) and (f) since those claims were raised on direct appeal and, hence, were presented to the state appellate courts.  Petitioner raised claim 1 (j) in her PCRA petition, and then raised that claim on appeal from the denial of PCRA relief.  Therefore, state court remedies were exhausted as to this claim as well.

Petitioner's claims 3 (b) and (c) challenging the trial court's rulings with respect to DNA evidence were deemed waived by the Superior Court on direct appeal on the basis that no objection had been made at trial.  This is a finding of procedural default that will be addressed below.

Claim 3 (j), asserting a violation of the <u>Bruton</u> rule, was not presented to the state appellate courts as a claim of trial error, but was instead raised in the context of an ineffective assistance claim on direct appeal, and that ineffective assistance claim is presented here as claim 1 (g).  This also is a procedural default issue that will be addressed below.

Petitioner's remaining claims fall into two categories.  Some of the claims were presented in Sloan's Amended PCRA Petition, but were not then raised on appeal from the denial of PCRA relief (claims 1 (i) and (m)).  The failure to present these claims on appeal from the denial of PCRA relief constitutes a failure to exhaust state court remedies.  Sloan's remaining claims were never presented to the state courts and, clearly, state court remedies were not exhausted as to these claims.

Pennsylvania law now forecloses Petitioner from seeking further relief on all of her unexhausted claims because she has already filed a PCRA petition, and her conviction became final more than a year ago.  42 Pa.C.S.A. § 9545(b)(1) (petition, even second or subsequent, must be filed within one year of the time conviction becomes final).  "If a claim has not been fairly presented to the state courts but state law clearly forecloses review . . . exhaustion is excused . . . but the doctrine of procedural default may come into play."  <u>Carpenter v. Vaughn</u>, 296 F.3d 138, 146 (3d Cir. 2002) (internal quotations and citations omitted).  Petitioner's failure to exhaust state court remedies with respect to many of her claims will, therefore, be excused on

the basis that she no longer has any available means of raising her claims in the state courts, but the Court must now evaluate those claims in the context of procedural default.

### 2. Procedural default

Even where the exhaustion requirement is not a bar to review, a federal court may be precluded from reviewing claims under the procedural default doctrine.  Gray v. Netherland, 518 U.S. 152 (1996); Coleman v. Thompson, 501 U.S. 722 (1991).  Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system; it is based upon the "independent and adequate state ground" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment.  Coleman, 501 U.S. at 750.  Federal habeas review is not available to a petitioner whose constitutional claims have not been addressed on the merits due to procedural default unless a petitioner can demonstrate: 1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or 2) that failure to consider the claims will result in a fundamental miscarriage of justice.  Id.

As noted above, Claims 3 (b) and (c) concerning the trial court's rulings on DNA evidence were deemed to have been waived on direct appeal.  This is a state court procedural default barring review absent a showing of cause and prejudice or a fundamental miscarriage of justice.

### a. Cause and prejudice

An attorney's deficient performance can be properly characterized as the "cause" of a procedural default only where the deficiency is sufficiently egregious to constitute a violation of the Constitution.  Cristin v. Brennan, 281 F.3d 404, 420 (3d Cir. 2002).  Here, Sloan did assert in

her state court direct appeal that trial counsel rendered ineffective assistance in failing to object to the trial court's rulings on the DNA evidence, and Superior Court addressed those claims.  The ineffective assistance of trial counsel claims that were addressed on the merits by the state courts are presented here as claims 1 (c) and (d).  Later in this Report, the undersigned concludes that trial counsel did not render ineffective assistance in failing to object to the trial court's rulings on DNA evidence and, therefore, Petitioner cannot establish cause for her procedural default of claims 3 (b) and (c).

A similar result applies with respect to Petitioner's claim 3 (j), alleging a violation of the Bruton rule, which was not presented to the state appellate courts as a claim of trial error, but was instead raised in the context of an ineffective assistance claim on direct appeal.  Again, Superior Court ruled on this as an ineffective assistance claim, and the ineffective assistance claim is presented here as claim 1 (g).  Because the Court concludes (later in this Report) that trial counsel did not render ineffective assistance in failing to object at trial, Sloan is unable to establish cause for her procedural default of the underlying claim.  Petitioner cannot overcome her procedural default of Claim 3 (j).

All of the remaining claims raised by Sloan as to which state court remedies have not been exhausted[8] share at least one common state court procedural default.  Although some of the claims could have been presented on direct appeal, and the failure to do so is a separate procedural default barring review, **all** of the claims, including those that could have been presented on direct appeal, could also have been raised during Sloan's PCRA proceeding as ineffective assistance of trial and/or appellate counsel claims and either were not raised, or were raised initially but then abandoned on appeal from the denial of PCRA relief.  This failure to

---

[8]    I.e., all claims except claims 1(c), (d), (e) (with respect to the failure to retain a DNA expert only), (f), (g) and (h) and claim 3 (e) and (f).

raise claims on collateral review, or on appeal from collateral review, is a separate state court

procedural default.  42 Pa. Cons. Stat. §9544(b) (issue is waived if petitioner failed to raise it and

the issue could have been raised before trial, at trial, on appeal, in habeas corpus proceeding, or

in prior proceeding under PCRA).  The "cause and prejudice" standard applies whether the

default in question occurred at trial, on appeal, or on state collateral attack.  Edwards v.

Carpenter, 529 U.S. 446, 451 (2000).

Petitioner's sole assertion of "cause" for the failure to raise claims in the state courts is

ineffective assistance of counsel.  The Court has already noted that ineffective assistance of

counsel may establish the "cause" of a procedural default, but only when the deficiency is

sufficiently egregious to constitute a violation of the Constitution.  Cristin, 281 F.3d at 420.  A

petitioner has no constitutional right to counsel when pursuing collateral relief in state court.

Pennsylvania v. Finley, 481 U.S. 551, 555 (1987).  Because the Constitution afforded Sloan no

right to counsel during her PCRA proceeding, or on appeal from the denial of PCRA relief,

Sloan cannot rely on PCRA counsel's failure to raise issues to establish "cause" for the defaults

arising from her failure to present claims on collateral review. Hull, 991 F.2d at 91.  Therefore,

Sloan cannot establish "cause" with respect to any of her defaulted claims.  The court need not

consider the "prejudice" prong because Sloan has not established "cause" for the procedural

default.  See Carrier, 477 U.S. 478, 495 (1986).

### b.  Fundamental miscarriage of justice

The Court, having found all but a handful of Petitioner's claims barred by the doctrine of

procedural default, must now consider whether failure to address those claims will result in a

fundamental miscarriage of justice.  The fundamental miscarriage of justice standard applies

only in the "extraordinary" and "exceedingly rare" case in which the petitioner presents to the

federal habeas court "new" evidence that was not presented at trial that shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995) (citing Murray v. Carrier, 477 U.S. 478, 496 (1986) and McClesky v. Zant, 499 U.S. 467, 494 (1991)).  "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial." Id.  If this requirement is satisfied, the federal court must consider "whether it is more likely than not that no reasonable juror would have convicted [petitioner] in light of the new evidence." Hubbard v. Pinchak, 378 F.3d 333, 340 (3d Cir. 2004). Significantly, "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." House v. Bell, 547 U.S. 518, 538 (2006).

In the habeas corpus context, a federal court sits to ensure that an individual is not imprisoned in violation of the Constitution and laws of the United States, "not to correct errors of fact." Herrera v. Collins, 506 U.S. 390, 400 (1993).  Therefore, a finding of actual innocence is not an independent ground for habeas corpus relief.  It is, instead, a "gateway" through which a petitioner can pass to have a federal court consider underlying claims that would otherwise be subject to procedural default.  Id. at 404.  In the absence of new evidence of the petitioner's innocence, the existence of an underlying constitutional violation provides a federal court with no basis for adjudicating a procedurally defaulted claim.  Goldblum v. Klem, 510 F.3d 204, 225-226 (3d Cir. 2007) (addressing actual innocence standard in context of abuse of the writ claim). Only after the presentation of new evidence may a federal court proceed to consider whether, in light of all of the relevant evidence, it is more likely than not that no reasonable juror would vote

to convict the petitioner of the crime for which he or she is incarcerated. House, 547 U.S. at 537-

539; Goldblum, 510 F.3d at 225-226.

"Actual innocence means 'factual innocence, not mere legal insufficiency.'" Sweger v.

Chesney, 294 F.3d 506, 523 (3d Cir. 2002) (citing Bousley v. United States, 523 U.S. 614, 623,

(1998)), cert. denied, 538 U.S. 1002 (2003). Here, Petitioner asserts that she is "actually

innocent" of first degree murder in that she has a valid defense premised upon battered woman's

syndrome and post-traumatic stress disorder that would negate the element of intent necessary

for a conviction of first degree murder. The undersigned will assume without deciding that the

actual innocence test does, in fact, apply to petitioners who argue a lesser degree of guilt. See,

Sweger, 294 F.3d at 522. While Sloan has satisfied the requirement that she identify a claim of

factual innocence, the Court still must determine whether she has met the exceedingly difficult

standard of establishing that no reasonable juror would vote to convict in light of all the

evidence, including the new evidence she has identified. House, 547 U.S. at 537-538.

Petitioner's proposed "gateway" in this case is premised upon allegations that trial

counsel failed to conduct a thorough investigation. Counsel is alleged to have failed to explore

Petitioner's history of abuse as a child, and to identify additional evidence that would have

supported a battered woman's syndrome defense in this case. Indeed, Petitioner argues that

counsel rendered ineffective assistance in failing to convince her to change her defense at trial

even in the face of her own insistence that she was not involved in the murder.

Petitioner presents a statement of "newly developed facts" wherein her history of

"childhood physical, sexual and psychological abuse" is set forth in some detail (Doc. 21, pp. 32-

39). An expert report from Faye E. Sultan, Ph.D. is also referenced. Dr. Sultan states that

Petitioner's history of abuse caused her to act at the time of the killing as if her daughter "was in

imminent danger" and that the "mental health sequelae" of her history of abuse as a child and during her relationship with Willis Casteel prevented her from forming the specific intent to kill (Doc. 21-4). She also is of the opinion that Petitioner has no active memory of events due to "dissociative amnesia" again caused by a lifetime of abuse (Id., p. 15).

It is helpful to discuss Petitioner's proposed defense in more detail. At trial, Petitioner's defense was that she voluntarily, but falsely, confessed to the crime in an attempt to protect her daughter who had already confessed to the crime and implicated Petitioner. Petitioner now argues (with the benefit of hindsight) that such a defense stood no chance of success, and that trial counsel had a duty to explore other alternatives. Had trial counsel conducted a "social history investigation," Petitioner's "abused background" would have been discovered, and this information could then have been presented to "an appropriate mental health professional" (Doc. 21, p. 45).[9] This would, according to Petitioner, have led to a finding that she had suffered much of her life from "post-traumatic stress disorder" and that Petitioner's "denial of the homicide . . . was **likely** a dissociative amnesia produced by post-traumatic stress disorder." (Doc. 21, ¶¶ 124, 130) (emphasis added). Simply put, the proposed alternative to the defense actually presented at trial is this: Sloan **did** help her daughter kill and then bury Willis Casteel, but she acted without specific intent due to a history of abuse since childhood, culminating in the abuse she suffered at Casteel's hands (battered woman's syndrome and post-traumatic stress disorder). Further,

---

[9]     Interestingly, one such mental health professional suggested by Petitioner is Dr. Mary Ann Dutton, who **was** retained by trial counsel in this case to explore the possibility of a diminished capacity or battered woman's syndrome defense, but who declined to interview Petitioner after being informed that Petitioner was denying involvement in the crime. Trial counsel is specifically faulted by Petitioner for failing to conduct a social history investigation "that would have been essential to Dr. Dutton to render an expert opinion about petitioner's state of mind at the time of the offense" (Doc. 21, ¶ 121). Petitioner does not explain why Dr. Dutton did not request, or take the opportunity to obtain on her own, such "essential" information before she declined to interview Petitioner.

Sloan's mental condition was such that she likely did not recall these events when she confessed, and she still has no recollection of events (dissociative amnesia).

The defense proposed by Petitioner is not entirely different from the defense she actually presented at trial, with the major difference being the accuracy, as opposed to the truthfulness, of Petitioner's confession.  At trial, Petitioner argued that her confession was a lie she fabricated in an attempt to protect her daughter, and that she gleaned the details necessary for her confession from her discussions with police.  Thus, her confession was both inaccurate (since she was not, in fact, involved in the murder) and fabricated (i.e., Petitioner was making it up).  Now, however, Petitioner asserts that a better defense, one which would have prevented a finding of the intent necessary to support a conviction of first degree murder, would have been to argue to the jury that her confession, although fabricated due to Petitioner's lack of any memory of relevant events, was nonetheless accurate because she did, in fact, participate in her husband's murder, albeit without the ability to form the specific intent to kill.

The difficulty with Petitioner's proposed defense as an actual innocence gateway is that it still possesses many of the same weaknesses as the defense she presented at trial.  Most critically, Petitioner's new defense would still require her to credibly explain to a jury how she gave an intentionally false yet detailed confession to a crime without possessing any personal knowledge of the crime itself.  Petitioner claims the details in her confession came from her discussions with police, and that her statement was "rehearsed" numerous times.  Detective Kranitz testified that he did not provide details prior to Petitioner's confession.  This factual dispute has already been resolved against Petitioner by one jury, and nothing presented by Petitioner establishes that a second jury would be acting unreasonably in making the same determination.  If the jury is convinced by Petitioner's confession that she possessed personal

knowledge of the crime, then her proposed new defense would be fruitless since the confession also contains evidence of premeditation, and would permit the jury to reject her battered woman's syndrome defense.

Petitioner's new defense of amnesia concerning the murder would still require her to explain events subsequent to the murder, including her call to Neely at Thanksgiving stating that Casteel had "taken off" (TT 412).  A jury could reasonably find that this telephone call is inconsistent with her defense that she had no idea of Casteel's whereabouts, and that it was an attempt to create an appearance that he left rather than that he was missing.  Likewise, the matter of Casteel's social security checks being cashed long after his death would still provide a reasonable jury with the ability to infer a motive for killing Casteel.

Petitioner's newly proposed defense possesses weaknesses that her defense at trial did not possess.  At trial, Petitioner could explain why she and her daughter never discussed the murder after it occurred, i.e., Petitioner was not involved, and her daughter clearly would not want to admit her own guilt.  Petitioner's new defense, however, would require her to undertake the difficult task of convincing a jury that she lived with her daughter/accomplice for months after the murder (and presumably remained in contact with her in the ensuing 15 years prior to her arrest) but that the subject of the two of them killing and then dragging a large, dead man to the basement of their home for burial apparently never came up.  Petitioner's amnesia may arguably explain her lack of memory of the murder, and may have caused her not to discuss the issue, but why would her daughter remain silent?  A reasonable jury could conclude that such a scenario is simply not credible, and could reject Petitioner's defense on this basis as well.

Finally, Petitioner's proposed defense also prevents her from implying, as she did at trial, that Neely had the help of a larger, stronger person in killing Casteel.  While this is certainly not the best defense, it, at least, has the benefit of consistency.

In short, considering all of the new evidence presented by Petitioner, and all of the other evidence in this matter, there remain several legitimate reasons for a jury to reject the proposed defense, just as there were several legitimate reasons for a jury to reject the defense presented at trial.  In this respect, Petitioner's burden is not to establish that she might have had a better chance of convincing the jury with her new defense.  In order to defeat the procedural default barring review, Sloan needs to establish that no reasonable juror could hear her new defense and still convict her.  <u>House</u>, 547 U.S. at 537-539; <u>Goldblum</u>, 510 F.3d at 225-226.  She has not.

Comparison of the entire factual situation in this case to the factual situation in <u>House</u> is instructive.  Paul House was convicted of murdering a woman after kidnapping and raping her and was sentenced to death.  Semen consistent with House's was found on the victim, and the victim's blood was found on House's pants.  The remaining evidence was circumstantial, and did nothing more than place House near the scene of the crime acting suspiciously.  On habeas review, House presented a new DNA analysis conclusively establishing that the semen found on the victim was not his at all, but was the victim's husband's semen.  Additional new evidence included testimony from "an Assistant Chief Medical Examiner [who] believes the blood on House's jeans must have come from autopsy samples" based upon chemical analysis, and an admission by the prosecution that blood from the vial taken at the autopsy spilled during transport of the evidence packet that included both the vial and House's jeans.  547 U.S. at 547.  Further, witnesses testified that the victim's husband drunkenly confessed to the killing, that he

routinely abused the victim, and had made comments shortly before the murder that he needed to "get rid of" the victim.  All of this led to the Court to conclude:

> . . . the central forensic proof connecting House to the crime-the blood and the semen-has been called into question, and House has put forward substantial evidence pointing to a different suspect.  Accordingly, **and although the issue is close**, we conclude that this is the rare case where-had the jury heard all the conflicting testimony-it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt.

547 U.S. at 553 (emphasis added).  If the complete destruction of the prosecution case described in House still leaves a close actual innocence issue for the Court, then this case cannot possibly satisfy the test where Sloan is proposing an alternative defense that may have been slightly more likely to prevail than the one she presented at trial.

Petitioner's reliance upon Tice v. Wilson, 425 F.Supp.2d 676 (W.D. Pa. 2006) is misplaced.  In fact, comparison of the ruling in Tice with this case counsels in favor of a finding that the actual innocence standard has not been met here.

There were two charges in Tice involving the petitioner's alleged sexual abuse of his niece.  Tice was incarcerated at a halfway house during the time the offenses occurred, and he was released on weekends, alternating between his two sisters' homes.  One charge alleged that he committed a sexual assault on a specific weekend, and the other charge was that assaults had occurred over a broader period of time.  At the time of his trial, Tice did not recall the specific weekends he spent at each of his sisters' homes, and his attorney did not obtain the records from the halfway house where Tice was incarcerated.  Had counsel done so, he would have discovered that Tice could not have been with his niece on the weekend involving the date-specific charge.  Thus, as to the offense charged, Tice had clearly made a credible allegation of actual innocence

and further had established that no reasonable juror could have convicted him of the crime charged if presented with the new evidence.

Tice, however, also made several arguments with respect to the more general charge against him.  He argued that the same halfway house records established that someone other than he assaulted the victim, and that this, combined with additional evidence impeaching the victim's testimony, would prevent a reasonable jury from convicting him.  425 F.Supp.2d at 682.  The Court concluded that this evidence did not rise to the level of "new" evidence that was not presented at trial that shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent" as required by Schlup because it did not "preclude" the more general charge.  Id.  As was the case with respect to the more general charge in Tice, the Court here is faced with a different defense, but not one which would prevent a reasonable juror from convicting Petitioner.

A reasonable juror could view all of the evidence presented by Petitioner, including all of the new evidence she proposes, and still conclude that she intentionally conspired with her daughter to kill and then bury Willis Casteel.  Therefore, Petitioner has not presented evidence sufficient to open the actual innocence gateway in this case and consideration of her defaulted claims is barred.[10]

---

[10]     Petitioner also argues that she has presented additional, new evidence in the form of her physical disability at the time of her confession, as well as her diagnosis of depression and use of anti-depressant medication at that time.  Petitioner argues that trial counsel should have made additional arguments in support of the motion to suppress the confession.  As discussed below, the confession in this case was manifestly voluntary and this is established by Plaintiff's own sworn testimony that she intentionally chose to confess to deflect blame from her daughter.  Therefore, evidence that Plaintiff was depressed or taking medication does not establish that the confession was involuntary, and it certainly has no relevance to an actual innocence inquiry.

         Likewise, evidence in the form of expert testimony opposing the Commonwealth's DNA expert, and additional cross-examination of other Commonwealth witnesses does not constitute "new" evidence of actual innocence.  Further, as discussed below, there would have been no

H.    **Merits of the remaining claims.**

The Court will now address those of Petitioner's claims that are not barred by procedural default.[11]  A federal court may not issue a writ of habeas corpus unless it concludes one of two scenarios exist: (1) that the state court's adjudication resulted in a decision that is "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States; or (2) the state court adjudication was based on an unreasonable determination of the facts in light of the evidence presented.

"Under §2254(d)(1)'s unreasonable application clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

With respect to 28 U.S.C. § 2254(d)(2)'s "unreasonable determination of the facts" clause, a petitioner must demonstrate that a reasonable fact-finder could not have reached the same conclusions given the evidence.  If a reasonable basis existed for the factual findings

---

10 (cont.)
 merit to a challenge to the admission of the DNA evidence, whether or not supported by expert testimony.
        Evidence not admitted at trial in the nature of testimony from Vivian Dominick that Willis Casteel was violent toward a woman he lived with prior to meeting Petitioner does not support a claim of actual innocence because Plaintiff was not aware of Casteel's actions at the time of the offense.
        Finally, the presence of one of the jurors at a large holiday party hosted by the District Attorney does not implicate Petitioner's actual innocence.
        Nonetheless, in abundance of caution, all of the above "additional evidence" was considered in making the actual innocence determination above.

11        Petitioner's arguments are devoted almost exclusively to claims that are barred by procedural default (e.g., the defaulted claim that trial counsel failed to request a limiting instruction regarding the use of Bonnie Neely's confession is argued (Doc. 21, p. 53), but no argument is presented regarding the Bruton claim that is properly before this Court).  The Court will limit its merits discussion to those claims that are not barred by procedural default, and will address all such claims whether or not specific argument has been presented in Petitioner's briefing.

reached in the state court, then habeas relief is not warranted. <u>Campbell v. Vaughn</u>, 209 F.3d 280, 290-91 (3d Cir. 2000), <u>cert</u>. <u>denied</u>, 531 U.S. 1084, 121 S.Ct. 789, 148 L.Ed.2d 685 (2001). Furthermore, "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### 1.    Suppression of the confession (Claim 3(e))

Petitioner's pre-trial motion to suppress her confession was denied by the trial court.  The court noted that Petitioner was given "thorough and comprehensive <u>Miranda</u> warnings" prior to her statement, and then addressed the issue of voluntariness:

> While the Defendant may have been aroused from sleep when initially confronted by several police officers with the accusation that she was suspected of killing her spouse, she had the presence of mind to deceitfully deny any knowledge of Casteel's whereabouts, and declare that they had divorced.  Later, in her confession, she explained that she had divorced Casteel following his death in an attempt to quell suspicions about his disappearance.  In other words, her initial response to the officers' questioning suggests that she was lucid and far from submissive when faced with accusations of the legal authorities.

(State Court Record, Doc. 31, p. 4).

Petitioner repeated her challenge in post-trial motions, and additionally argued that Detective Kranitz gave contradictory testimony at the pre-trial hearing and at trial.  The trial court found that the alleged inconsistency was, in fact, simply a matter of the Detective answering a different question at trial than had been asked in the suppression hearing, and that any inconsistency was with respect to "a minor detail" (State Court Record, Doc. 87, p. 2).  The trial court noted Petitioner's own inconsistency in that she continued to argue that her confession was involuntary, but testified at trial that she "voluntarily, deliberately and intentionally incriminated herself for the sake of her daughter" (<u>Id</u>., p. 3).

On direct appeal, the Superior Court rejected Petitioner's challenge to the trial court's denial of the motion to suppress her confession to police after considering "the duration and means of interrogation, the physical and psychological state of the accused, the conditions attendant to the detention, the attitude of the interrogator, and any and all other factors that might overcome the will of the accused to withstand suggestion and coercion." (Doc. 13-3, p. 33). Petitioner was questioned for "a short period of time in her home," and had the "presence of mind" to deny involvement and show officers a copy of her divorce decree in an attempt to deflect suspicion (Doc. 13-3, p. 4). The court noted that no evidence of coercion was presented at the suppression, and that Petitioner's testimony at trial to the effect that her statement was a calculated ploy on her part to deflect blame from her daughter was inconsistent with a claim of coercion (Id.).

To determine whether a statement was voluntary, a federal habeas court must examine the totality of the circumstances and decide whether the statement was made of petitioner's free will, or through some overbearing of the petitioner's will. Miller v. Fenton, 741 F.2d 1456, 1465-66 (3d Cir. 1984); see Schneckloth v. Bustamonte, 412 U.S. 218 (1973). This is the same standard applied by the state courts. Here, the state courts found no evidence that Petitioner's will was overborne, and instead found that Petitioner voluntarily spoke with police after being informed of her rights. Petitioner's later testimony at trial that this was a ploy on her part to deflect blame from her daughter is additional evidence that the statement was voluntary and not the product of coercion. The state court's factual findings are presumed correct, and Petitioner has not presented evidence sufficient to rebut that presumption. The state court's decision to deny the motion to suppress in this case is not based upon an unreasonable determination of the

facts.  Likewise, the state court's ruling is neither contrary to nor an unreasonable application of federal law.  Petitioner's claim does not warrant relief.

### 2.    Corpus Delicti rule (Claim 3(e))

Pennsylvania's *corpus delicti* rule "places the burden upon the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting [her] to the crime can be admitted." <u>Comm. v. Verticelli</u>, 706 A.2d 820, 822 (Pa. 1998) (citations omitted).  The application of the rule occurs in two phases, with the trial court first ruling on the admissibility of the confession, followed by a jury instruction requiring that the jury consider a confession only after being convinced beyond a reasonable doubt that the *corpus delicti* has first been established beyond a reasonable doubt.  <u>Jacobs v. Horn</u>, 395 F.3d 92, 109-110 (3d Cir. 2005).

Petitioner asserts that the trial court erred in failing to initially make a ruling on admissibility prior to submitting the issue to the jury.  At trial, the defense objected to admission of Sloan's confession on the basis that the victim's identity had not been established (Doc. 13-3, p. 38).  The trial court found that "the scientific evidence which the Commonwealth has offered . . . [provided a] sufficient basis to establish by inference that [the body] was Willis Casteel." (<u>Id</u>.).  On post-trial motions, the trial court noted what it viewed as an attempt "to read this passage as the court having left the determination solely to the jury."  (State Court Record, Doc. 87, p. 5).  The court rejected that attempt and confirmed that it **had** made the requisite finding before it "allowed the confession to be entered into evidence" (<u>Id</u>., p. 6).  On appeal, the Superior Court concluded that the trial court's ruling, "[a]lthough not expressed in the clearest of terms," was to the effect that the Commonwealth had met its initial burden under the first phase of Pennsylvania's *corpus delicti* rule (<u>Id</u>.).

First, the trial court's alleged failure to technically comply with Pennsylvania's *corpus delicti* rule is an issue of state law, and does not rise to constitutional dimension.  Compare Evans v. Luebbers, 371 F.3d 438, 443 fn. 3 (8th Cir. 2004) (standards of Missouri *corpus delicti* rule irrelevant if the evidence meets the federal constitutional requirement of "substantial independent evidence that the offense has been committed, and the evidence as a whole proves beyond a reasonable doubt that defendant is guilty.").

Second, the trial court and the Superior Court both concluded that a ruling had been made in accordance with state law.  This is a finding supported by the record that is presumed correct, and Petitioner has not rebutted that presumption.

Third, and finally, Petitioner is not contesting that there exists "substantial independent evidence" of the offense, or that the jury did as it was instructed and found that a crime had been committed beyond a reasonable doubt before it considered Petitioner's confession.  Any such challenge would necessarily fail because the prosecution presented clear evidence (circumstantial as well as scientific) apart from Petitioner's confession that a murder had been committed and that the victim was Willis Casteel.

The state court's ruling concerning the *corpus delicti* in this case is either irrelevant because it relates solely to a matter of state law, or it does not warrant habeas relief because it is neither contrary to nor an unreasonable application of federal law.

### 3.      DNA evidence (Claims 1(c), (d) and (e))

Petitioner next makes three related claims of ineffective assistance of trial counsel with respect to the DNA evidence admitted during her trial.  The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial."  Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)).  The Supreme

Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance:  1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense.  Strickland, 466 U.S. at 687.  To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct.  Strickland, 466 U.S. at 690. [12]

The first prong of the Strickland test requires a defendant to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 688.  A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689.  The question is not whether the defense was free from errors of judgment, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place.  Id.

The second prong requires a defendant to demonstrate that counsel's errors deprived him or her of a fair trial and the result was unfair or unreliable.  Strickland, 466 U.S. at 689.  To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694 (emphasis added).  A "reasonable probability" is one that is sufficient to undermine confidence in the outcome.  Id.

---

[12]   The Pennsylvania standard, applied by the state courts, is not itself contrary to or an unreasonable application of Strickland.  Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir. 2000).

Petitioner first asserts that trial counsel failed to request a <u>Frye</u> hearing concerning the admissibility of the Commonwealth's mitochondrial DNA evidence comparing the victim's DNA with that of Willis Casteel's sister.  Trial co-counsel James Wells testified during a post-trial hearing to his extensive research that convinced him prior to trial that mitochondrial DNA testing was accepted in the scientific community, but that there were questions about the significance of any statistical analysis the prosecution wished to present because the FBI database was so limited (PST 43).  Wells objected at trial only to the statistical evidence, and considered it a victory to keep the statistical evidence out, as this permitted the defense to argue that the "DNA match" was insignificant and did not identify the body as Willis Casteel (PST 44).

The trial court found that counsel had not rendered ineffective assistance in failing to request a <u>Frye</u> hearing because "there is nothing in the record or case law to suggest that a <u>Frye</u> hearing was indicated in the present circumstances."  (State Court Record, Doc. 87., p. 6).  The Court earlier noted that at least one Pennsylvania court had determined that the mitochondrial DNA testing used by the Commonwealth had achieved general acceptance in the scientific community and, therefore, was admissible.  (State Court Record, Doc. 87, p. 4) (citing cases).  Indeed, the undersigned was able to locate several other contemporaneous cases to the same effect. <u>State v. Begley</u>, 956 S.W.2d 471 (Tenn.1997); <u>State v. Ware</u>, 1999 WL233592, at *17 (Tenn.Crim.App. 1997) (mitochondrial DNA "extensively" studied and "well understood and characterized"); <u>State v. Council</u>, 515 S.E.2d 508 (S.C. 1999); <u>State v. Underwood</u>, 518 S.E.2d 231 (N.C. Ct. App. 1999).  The trial court found that there was no merit to the underlying claim.  The trial court's ruling is neither contrary to nor an unreasonable interpretation of federal law, since counsel will not be deemed ineffective for failing to raise a meritless claim.  <u>Beuhl v. Vaughn</u>, 166 F.3d 163, 174 (3d Cir. 1999).

Next, Petitioner asserts that trial counsel rendered ineffective assistance in failing to object when the trial court limited cross-examination of the Commonwealth's DNA expert. There were two expert reports offered by the Commonwealth with respect to DNA evidence. The first report contained evidence suggesting that the victim was a maternal sibling of Willis Casteel's sister, while the second report contained the statistical analysis of the probability that the DNA samples came from maternal siblings.  The trial court's decision to exclude the second report is the "victory" referred to by Mr. Wells.  What Petitioner now complains about is the trial court's related ruling that any attempt by the defense to argue the statistical probability of the remains being Willis Casteel's would necessarily permit the Commonwealth to introduce the statistical evidence contained in the second report.  This is alleged to constitute an unconstitutional limitation on Petitioner's right to challenge the evidence against her, and counsel is alleged to have rendered ineffective assistance in failing to object to this ruling.

The Superior Court found that "the defense motioned for the exclusion of the report and succeeded.  Appellant cannot prevail on such a motion and then expect to have free reign to cross-examine a witness on the subject that was successfully excluded." (Doc. 13-3, p. 7).  Wells agreed in his testimony during the post trial hearing, and believed that he had no basis for objection (PST 44).  Counsel had a reasonable basis for failing to object to his own victory in keeping damaging evidence out of the hands of the jury.  Further, the state court correctly ruled that any objection would have lacked merit.  The state court's ruling is neither contrary to nor an unreasonable application of federal law.

The third of these related claims is that counsel failed to retain a DNA expert to counter the Commonwealth's DNA evidence.  As noted above, co-counsel succeeded in limiting the Commonwealth's use of the statistical DNA evidence at trial.  Petitioner does not present any

evidence that counsel could have had more success had an expert been employed, particularly in light of the general acceptance of mitochondrial DNA testing at the time of trial. Therefore, Petitioner has failed to establish prejudice from counsel's alleged failure, and her claim of ineffective assistance fails.

### 4. Failure to object to Mogle's testimony

Petitioner argues that trial counsel was ineffective for failing to object to testimony from Commonwealth witness Mark Mogle concerning the rips and tears on Casteel's shirt and undershirt, and specifically how they were consistent with multiple cuts from a knife or knives, and also with a shotgun blast. Both the trial court and the Superior Court found that, as a matter of state law, Mogle qualified as an expert in identifying the probable source of cuts and tears in fabric and, accordingly, that counsel's failure to object did not constitute ineffective assistance (State Court Record, Doc. 87. Pp. 7-8; Doc. 13-3, pp. 12-13). The factual finding that Mogle is qualified as an expert is presumed correct, and Petitioner has not rebutted this finding. The state court's legal conclusion that any objection would have been fruitless is neither contrary to nor an unreasonable application of federal law because counsel will not be deemed ineffective for failing to make a baseless argument. Beuhl, supra.[13]

### 5. **Bruton** claim

Petitioner asserts that trial counsel was ineffective for failing to object when the Commonwealth improperly admitted the content of her daughter's confession in violation of the rule announced in Bruton v. United States, 391 U.S. 123 (1968). Bruton stands for the proposition that the Confrontation Clause is violated when a non-testifying codefendant's

---

[13] Further, other experts testified without objection that the Casteel's remains exhibited signs of knife wounds and a shotgun blast. Thus, Mogle's evidence was largely cumulative of other, uncontested evidence at trial and could not have caused Petitioner prejudice.

statement is introduced at a joint trial, and that statement names the defendant as a participant in the crime charged.  391 U.S. at 134-37.   The Court limited the Bruton rule in later cases, explaining that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Richardson v. Marsh, 481 U.S. 200, 211 (1987).

Here, the Commonwealth presented the following testimony from Detective Kranitz in its case-in-chief:

> Based on the information we learned from Bonnie Neely, we then obtained an arrest warrant for Patricia Sloan, who was her mother.

(TT 346).  Petitioner argued in the state court that the jury was left with the clear inference from this testimony both that Neely made a statement, and that the statement implicated Petitioner in the crime.  The Superior Court found that this testimony did not violate the rule in Bruton because there was no indication that Bonnie Neely made a statement, or that any statement she made implicated Petitioner (Doc. 13-3, p. 14).  Superior Court also noted that the defense itself chose to disclose the contents of Bonnie Neely's statement as part of her defense that "her knowledge of the crime as contained in her confession was gleaned from Neely's own confession" (Id., p. 14, fn. 5).

The rule in Bruton requires not only that confession of a co-conspirator be admitted at trial (an event that did not occur here until the defense chose to use Neely's confession for its own purposes), but also that the statement be "incriminating on its face."  Richardson v. Marsh, 481 U.S. 200, 208-211 (1987) (distinguishing Bruton in that the co-defendant's confession was not incriminating on its face).  Here, the statement made by Detective Kranitz did not reveal anything concerning any statement Neely made to police, and certainly did not constitute the use

of a statement by Neely that was "incriminating on its face" with respect to Petitioner. Therefore, and objection by counsel would have been meritless.  In any event, counsel had a reasonable basis for not objecting since the defense was itself intending to make use of Neely's statement.  The state court's ruling is neither contrary to nor an unreasonable application of federal law.

### 6.    Failure to call character witnesses

The last claim that is not procedurally barred is Petitioner's assertion that trial counsel rendered ineffective assistance in failing to locate, interview and present the testimony of character witnesses.  The trial court conducted an evidentiary hearing after trial, and trial counsel Monzo testified that Petitioner gave him three names of character witnesses: Nancy Wells, Peter Sowatskey and Hazel Flynn (PST2 6).  Wells and Sowatskey did not know Sloan at the time of the murder (PST2 6, 10).  Monzo abandoned any attempts to present character witnesses after discovering that while the witnesses may have known Sloan personally, they were not aware of Sloan's reputation in the community (PST2 9).

The trial court found that the witnesses identified by Petitioner were either unavailable or "did not have relevant character testimony to offer."  (State Court Record, Doc. 87, p. 9).  It, therefore, ruled that counsel did not render ineffective assistance.  Petitioner has not presented evidence that would rebut the underlying factual findings concerning the availability of witnesses or the admissibility of their testimony.  On the factual record thus established, the state court's ruling is neither contrary to nor an unreasonable application of federal law.

### I.    Evidentiary hearing

Petitioner argues that she is entitled to an evidentiary hearing in order to further develop claims and to present additional evidence concerning her claims of actual innocence.  It must be

remembered that, even where discovery is permitted in a habeas proceeding, or where a habeas petitioner has himself obtained additional evidence, there is no absolute requirement that the Court supplement the state court record, nor must the Court permit an evidentiary hearing.  The Court has considered additional evidence submitted by Petitioner in addressing the issue of procedural default for the purpose of addressing the actual innocence inquiry.  Nonetheless, the decision whether to conduct an evidentiary hearing is left to the district court's discretion. Goldblum v. Klem, 510 F.3d 204, 221 (3d Cir. 2007).  "[T]he Supreme Court has made clear that 'an evidentiary hearing is not required on issues that can be resolved by reference to the state court record.'"  Id. (quoting Schriro v. Landrigan, 127 S.Ct. 1933, 1940 (2007)).  Because the issues here, including the actual innocence inquiry, may be resolved by reference to the state court record (and the matters already submitted by Petitioner), the request for a hearing should be denied.

**J.     Certificate of Appealability**

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c).  Because Sloan has not made such a showing with respect to claims addressed on their merits, a certificate of appealability should be denied.  Likewise, a certificate of appealability should not issue with respect to the claims rejected on procedural grounds because jurists of reason would not find it debatable whether the procedural rulings made above are correct. Slack v. McDaniel, 529 U.S. 473 (2000).

**III. CONCLUSION**

It is respectfully recommended that the Petition for Writ of Habeas Corpus filed by Patricia Sloan be dismissed and that a certificate of appealability be denied.

In accordance with the Magistrate's Act, 28 U.S.C. § 636 (b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules for Magistrates, objections to this Report and Recommendation are due by April 2, 2010.


March 19, 2010                                        s/Cathy Bissoon
                                                     CATHY BISSOON
                                                     UNITED STATE MAGISTRATE JUDGE